**Page 1**

```
 1      IN THE DISTRICT COURT OF PAYNE COUNTY
 2            STATE OF OKLAHOMA
 3
 4  TYLON MACKEY,        )
                         )
 5      Plaintiff,       ) Case No. CJ-2020-233
                         )
 6  vs.                  )
                         )
 7  ISRAEL JUAREZ, individually, )
    ORD TRUCKING, INC., FREDY N. )
 8  VALLE, SR. d/b/a VALLE       )
    TRUCKING, and SILVER STAR    )
 9  CONSTRUCTION COMPANY, INC.,  )
                         )
10      Defendants.      )
11
12
13          DEPOSITION OF JESUS ORDONES
14
15      TAKEN ON BEHALF OF THE PLAINTIFF
16
17        IN OKLAHOMA CITY, OKLAHOMA
18
19              ON JULY 20, 2023
20
21
22
23
24   REPORTED BY: MARY E. (LIZ) WAGGONER, CSR #00393
25
```

**Page 2**

```
         ** APPEARANCES **

APPEARING ON BEHALF OF THE PLAINTIFF:
    Ryan Polchinski
    Andrew Polchinski
    Attorneys at Law
    LAW OFFICES OF DANIEL M. DAVIS
    300 N. Walnut
    Oklahoma City, Oklahoma 73102
    ryanp@dandavislaw.com

APPEARING ON BEHALF OF DEFENDANT, ORD TRUCKING:
    Rodney D. Stewart
    Attorney at Law
    STEWART LAW FIRM
    801 N.W. 63rd Street
    Oklahoma City, Oklahoma 73118
    rds@stewartlaw.com

APPEARING ON BEHALF OF DEFENDANT, ISRAEL JUAREZ:
    Mark A. Warman
    Attorney at Law
    15 W. Sixth Street
    Suite 2900
    Tulsa, Oklahoma 74119-5423

APPEARING ON BEHALF OF DEFENDANT, VALLE TRUCKING:
    Jeffrey A. Curran
    Attorney at Law
    GABLEGOTWALS
    BOK Park Plaza
    499 W. Sheridan Avenue
    Suite 2200
    Oklahoma City, OK 73102
    jcurran@gablelaw.com
```

**Page 3**

```
APPEARING ON BEHALF OF DEFENDANT, SILVER STAR
CONSTRUCTION:

    J. Chris Horton
    Attorney at Law
    PAIN & GARLAND
    P.O. Box 158
    111 Southwest Second Street
    Anadarko, Oklahoma 73005
    jchrishorton@live.com

APPEARING ON BEHALF OF DEFENDANT, SILVER STAR
CONSTRUCTION:

    Timothy Harmon
    Attorney at Law
    COFFEY SENGER WOODARD, PLLC
    4725 East 91st Street
    Suite 100
    Tulsa, Oklahoma 74137
```

**Page 4**

TABLE OF CONTENTS

                                              Page  Line
STIPULATIONS . . . . . . . . . . . . . .        5    1
JESUS ORDONES TESTIFIES:
  DIRECT EXAMINATION BY MR. POLCHINSKI . .      6    6
  CROSS-EXAMINATION BY MR. HORTON . . . .      51    3
  REDIRECT EXAMINATION BY MR. POLCHINSKI .    79   24
  RECROSS-EXAMINATION BY MR. HORTON . . .     86   17
JURAT PAGE . . . . . . . . . . . . . . .      89    1
CORRECTION PAGE . . . . . . . . . . . .       90    1
PROCEEDINGS CONCLUDED . . . . . . . . .       91    1

         ** EXHIBITS **

PLAINTIFF'S EXHIBIT NO. 1 . . . . . . .       11   13
  (Interrogatories)

### Page 9

1  that down on the record for us. Is that okay?
2      A. Okay.
3      Q. So I'm not trying to be a jerk, Mr. Ordones.
4  I'm going to butcher your name a million times. I
5  apologize.
6      A. No. That's fine.
7      Q. But if you do not give me a verbal answer or
8  a yes or no to a yes or no question I will haunt you
9  for that. Is that okay?
10     A. Yes.
11     Q. Okay. This is not an endurance test. I
12 don't think we'll be here too terribly long. But if
13 you need to take a break for whatever reason to speak
14 with me, speak with your attorney for whatever reason,
15 I don't need to know, just let me know that you need
16 to take a break. Is that okay?
17     A. Okay.
18     Q. But the only thing I ask of you is if I've
19 asked the question that you finish answering it before
20 we stop the record and go on a break. Is that okay?
21     A. Okay.
22     Q. Any questions for me or for your counsel
23 before we begin?
24     A. No.
25     Q. Okay. All right.

### Page 10

1          MR. STEWART: Before we begin I want to
2  take one of your rules and expand on it a little bit.
3  This lady sitting next to you --
4          THE WITNESS: Okay.
5          MR. STEWART: -- she has to take down
6  everything that he says.
7          THE WITNESS: Okay.
8          MR. STEWART: And everything that you say.
9          THE WITNESS: Okay.
10         MR. STEWART: So it's really important for
11 you not to talk at the same time he's still talking.
12         THE WITNESS: I understand. So he finish
13 I can talk.
14         MR. STEWART: Yes. In normal conversation
15 we talk over each other all of the time.
16         THE WITNESS: No.
17         MR. STEWART: In this setting, she has to
18 take down one at a time.
19         THE WITNESS: I wait for my turn.
20         MR. STEWART: All right. Thank you.
21     Q. (BY MR. POLCHINSKI) And I'll try to show you
22 the same respect. So if I do talk over you, let me
23 know you weren't finished, and we'll be fine. It's a
24 very weird dance that we're going to do today in here.
25 Okay?

### Page 11

1      A. Yes.
2      Q. What did you do today to prepare for today's
3  deposition?
4      A. Come here.
5      Q. Besides speaking with your attorney, I don't
6  want to know about any of those conversations, did you
7  review any documents before today's deposition?
8      A. I don't.
9      Q. Okay. Did you review your responses that you
10 gave to me earlier on in this case?
11     A. No.
12     Q. Okay. So I'm going to go ahead and hand
13 those to you as Plaintiff's Exhibit 1. And hopefully
14 I brought enough copies.
15         I just want you to flip to the last page of
16 this. And is that your signature down there?
17     A. Yes.
18     Q. And this would be the Verification page to
19 the answers that you gave to me. Correct?
20     A. Okay.
21     Q. Is that a yes? I'm sorry.
22     A. Yes.
23     Q. Okay. All right. Thank you.
24         Have you ever given your deposition before?
25     A. No, sir.

### Page 12

1      Q. Okay. As far as employers, who are you
2  currently employed by?
3      A. Employers?
4      Q. Employers, yeah. Who are you employed by
5  right now?
6      A. Right now?
7      Q. Yes, sir.
8      A. I got no current employer.
9      Q. So you're not working right now?
10     A. I work here and there and different places.
11     Q. I apologize.
12         Are you still working for ORD Trucking? Is
13 that your company?
14     A. Yes, yes. Sorry about that.
15     Q. That's okay. We'll get through this.
16     A. Okay.
17     Q. When was the last time ORD Trucking had any
18 work?
19     A. Any work?
20     Q. Uh-huh.
21     A. Work every day sometimes, like I'm currently
22 employed right now.
23     Q. Are you on any job sites right now doing
24 active work?
25     A. Yes.

### Page 13

1  Q. Okay. And what job sites are you on right
2  now?
3  A. I was working in northwest over there on
4  Highway 66.
5  Q. Okay. And what were you doing over there?
6  A. Doing some road over there. The grinding the
7  road, you know, to repair the road.
8  Q. So as far as ORD Trucking, what do you do as
9  far as your company?
10 A. Like me, driving.
11 Q. Just driving?
12 A. Yes, sir.
13 Q. Okay. And how long have you been on that job
14 site that you just described to me? I think you said
15 -- did you say N.W. 66th?
16 A. No. Highway 66.
17 Q. Highway 66?
18 A. Yes.
19 Q. And how long have you been doing that job?
20 A. It's like a back and forth job. I went back
21 weeks before. Then come back again there. They move
22 me over one place or the other.
23 Q. Are you working for any contractor on that
24 job?
25 A. In that job, I work for T.J. Campbell.

### Page 14

1  Q. T.J. Campbell?
2  A. Yes, sir.
3  Q. Okay. And how long have you been working for
4  T.J. Campbell?
5  A. I think we working for them for year and a
6  half or something like that.
7  Q. And is that consistent work or off and on?
8  A. No. Off and on.
9  Q. And describe to me -- strike that.
10    Are you doing the driving for ORD Trucking?
11 A. Yes, sir.
12 Q. Okay. And describe to me on any given day
13 when you're working for T.J. Campbell and you show up,
14 what does that look like? What does your day look
15 like?
16 A. Normal working day.
17 Q. Okay.
18 A. I mean --
19 Q. When you show up to the site is your truck
20 already there or do you drive it there?
21 A. I drive it there.
22 Q. Okay.
23 A. Yes.
24 Q. If T.J. Campbell wanted you to leave your
25 truck there overnight on their site could you do that?

### Page 15

1  A. Never leave the trucks on the road, you know,
2  because most of the jobs they're working on they're
3  lost.
4  Q. Okay. How are you paid by T.J. Campbell?
5  A. Hourly.
6  Q. Okay. Are you a 1099?
7  A. Yes.
8  Q. Okay. And are you required to be at T.J.
9  Campbell's job site at a certain time of day?
10 A. In mornings to start.
11 Q. Do you have a certain start time you have to
12 be there by?
13 A. 7:00. Sometimes later. It all depends.
14 Q. Can you sort of show up and start working at
15 any point in time in the morning or is there a
16 specific time you have to show up?
17 A. Specific time.
18 Q. And after you show up for a job with T.J.
19 Campbell and you check in for the day do they make you
20 fill out any paperwork when you arrive?
21 A. Ticket, hourly ticket.
22 Q. And what are you supposed to do with that
23 hourly ticket?
24 A. Well, fill it out, and at the end of the day
25 turn them over to the foreman and get signed up.

### Page 16

1  Q. And I'm ignorant to the whole process of
2  doing tickets and loads. Walk me through that. How
3  does that happen?
4  A. It's like a ticket with the information. You
5  put the job number, location, the place that you
6  deliver to, material, type of material, stuff like
7  that.
8  Q. Were there any time limitations that T.J.
9  Campbell has put on you on as far as how many loads
10 you have to do in a day?
11 A. No.
12 Q. Were you ever reprimanded if you didn't meet
13 a certain quota for the day with T.J. Campbell?
14 A. Like can you repeat the question?
15 Q. Yes, sir. Sorry. That was a bad question.
16    Did T.J. Campbell ever have any expectations
17 for you to hit a certain number of loads on that
18 ticket?
19 A. No.
20 Q. Okay. And I haven't been to that job site at
21 T.J. Campbell. I don't know what it looks like for
22 you.
23    When you show up for the day are there other
24 trucks there?
25 A. Yeah.

17

1  Q. Okay. And are you guys waiting for a loader
2  to dump material in each of the trucks?
3  A. Yes.
4  Q. Do you guys have to get in a line?
5  A. Yes.
6  Q. Okay. And is there any rhyme or reason to
7  where you are in that line or is it just everyone gets
8  in where they fit in?
9  A. Well, you get in the line to get loaded.
10  Q. And after you get loaded where do you go to?
11  A. Take it to place you have been assigned to.
12  Q. Okay. And who has told you to take it to a
13  certain location?
14  A. The foreman.
15  Q. Does the foreman physically show you where to
16  go? Do they drive you out there?
17  A. Yeah. Well, we already know where. I mean,
18  most of the times. Tell them to go to north plant or
19  different plants and stuff.
20  Q. And when you go to a plant to take a load
21  there do you have to check in with your ticket there?
22  A. No.
23  Q. Okay. What do you do when you show up to a
24  plant to drop off a load?
25  A. Just drop it, come back, and get another one

18

1  from there.
2  Q. Are there any representatives of T.J.
3  Campbell at the plant that are keeping track of who
4  comes in and out?
5  A. The foreman of the job site.
6  Q. Okay. But there's no one there stamping your
7  ticket when you come in and out of there, of the
8  plant?
9  A. (Witness shakes head).
10  Q. I'm sorry. Is that a no?
11  A. No. I mean, sorry. It's like when you're
12  doing maintenance on the streets, there's two
13  different types of jobs over there. Let me explain
14  something. Sorry about that.
15  Q. No. You're good. Go ahead.
16  A. Another one is asphalt. You've got to load
17  it at the plant. They know when you get loaded. Take
18  it down there.
19  Q. So let me ask you this way, and thank you for
20  clearing that up for me. I apologize. I was asking a
21  confusing question.
22  A. Yeah.
23  Q. Are there any timestamps on that ticket that
24  T.J. Campbell puts on there saying that you left from
25  picking up a load at this time and you dropped it off

19

1  at this time?
2  A. Well, no.
3  Q. Okay. Okay. So before your jobs with T.J.
4  Campbell with ORD Trucking who have you worked with
5  before that?
6  A. Was working with Ingram's Trucking.
7  Q. Do you know how to spell that? I'm sorry.
8  A. Ingram's.
9  Q. Ingram's. Do you know where they're located
10  at?
11  A. I don't have the place in mind.
12  Q. Are they here in Oklahoma City?
13  A. Yes.
14  Q. Okay. And what type of work do they do?
15  A. It's same with them. All of the roads, you
16  know. Construction stuff.
17  Q. And how long were you doing jobs for, is it
18  Ingram's or Egram's?
19  A. Ingram's.
20  Q. Ingram's?
21  A. Yes.
22  Q. Okay.
23  A. Sorry. My language. I'm trying to --
24  Q. No, no. We'll get it down.
25      How long were you working for them? I

20

1  apologize.
2  A. I work for him, like I'm still working
3  basically, you know. I work like him and go to other
4  places, yeah.
5  Q. Are you still doing any work for Fred Valle
6  Trucking?
7  A. Not any more.
8  Q. Okay. You understand we're here for an
9  accident that occurred on September 4th of 2019?
10  A. Yes.
11  Q. Since September 4th of 2019 have you worked
12  for Fred Valle?
13  A. No, sir.
14  Q. Okay. Is that the last job that you worked
15  --
16  A. Yeah.
17  Q. -- with Fred Valle?
18  A. (Witness nods head).
19  Q. Is there any reason why you haven't done any
20  work with Fred Valle Trucking since September 4th of
21  2019?
22  A. I never been called for him probably.
23  Q. So in between September 4th of 2019, the last
24  time you worked for Fred Valle, up to the time you
25  worked for Ingram's, if that's correct --

**Page 57**

1  Q. And then the other truck that you owned at
2  the time of the accident, were you driving that at
3  that time?
4  A. Yeah. It's still with me, yes.
5  Q. Okay. Was that on another job?
6  A. Yes.
7  Q. Okay. And where was that job?
8  A. I can't remember exactly where the truck was.
9  Q. But it was not in Stillwater?
10 A. No, sir.
11 Q. Okay. If I understand your testimony
12 correctly, you were never in Stillwater?
13 A. Never in Stillwater.
14 Q. On that job?
15 A. On that job, yes.
16 Q. Okay. Other than yourself at the time of
17 this accident did you have any other employees that
18 would have been a W2 employee of your company?
19 A. On the time of the accident?
20 Q. Yes, sir.
21 A. It was me and him.
22 Q. And when you say "him", you mean Israel
23 Juarez?
24 A. Israel Juarez, yes.
25 Q. Okay.

**Page 58**

1      MR. WARMAN: Israel for the record was not
2  a W2 employee.
3  Q. (BY MR. HORTON) Right. I think you
4  testified earlier that he was a 1099?
5  A. No, sir. That is correct.
6  Q. Is that your testimony?
7  A. W9.
8  Q. W9, he was a contractor?
9  A. Yes.
10 Q. Not a W2 employee?
11 A. Yes.
12 Q. All right. Did you have any other
13 contractors that worked for you at that time other
14 than Mr. Juarez?
15 A. No, sir.
16 Q. And did you have any other employees -- did
17 you have any employees that worked for you?
18 A. No, sir.
19 Q. Okay. So at the time of the accident it's
20 just you as an employee and owner of ORD Trucking.
21 Fair?
22 A. Yes.
23 Q. And Mr. Juarez --
24 A. Juarez.
25 Q. -- as a W9 contractor for your company?

**Page 59**

1  A. Yes.
2  Q. Okay. Do you understand -- I know you said
3  you didn't know Silver Star Construction.
4     Do you understand they are a road
5  construction company?
6  A. It's a road construction, yes.
7  Q. They're not a trucking company; you
8  understand that?
9  A. Yes.
10 Q. Okay. They hire trucking companies like your
11 own --
12 A. Uh-huh.
13 Q. -- to haul loads for them for their
14 construction -- for construction projects that they're
15 working on?
16 A. Uh-huh.
17 Q. Is that fair?
18 A. Yes.
19 Q. And that fits your understanding and your
20 knowledge of what Silver Star does?
21 A. Yes.
22 Q. Okay. In this particular case, and I want to
23 be perfectly clear, Silver Star did not enter into a
24 contract with your company, ORD, to provide hauling
25 services?

**Page 60**

1  A. Okay.
2  Q. Fair?
3  A. Yes.
4  Q. To your knowledge, and I believe this is what
5  you testified to earlier, Silver Star entered into a
6  contract with Fredy Valle of Valle Trucking to provide
7  hauling services on this project in Stillwater; is
8  that correct to your understanding?
9  A. Yes, because I don't know what kind of
10 contract they have over there with them.
11 Q. But do you understand the agreement was
12 between Silver Star and --
13 A. And Fredy Valle.
14 Q. Yes, sir.
15 A. Yes.
16 Q. Okay. All right. Fredy Valle, if I
17 understand, approached you to provide an additional
18 truck and driver?
19 A. Yes.
20 Q. Okay. And you agreed to do that?
21 A. Yes.
22 Q. And you -- and, so, it was your decision as
23 the owner of ORD Trucking to put Mr. Juarez in one of
24 your trucks to provide to Valle Trucking; is that
25 fair?

Page 61

1  A. Yes, sir.
2  Q. Okay. And if I understand your testimony
3  correctly that it was your -- it was you who retained
4  his services as the owner of ORD Trucking and not --
5  Silver Star didn't hire Mr. Juarez. Is that fair?
6  A. Yeah.
7  Q. Is that fair?
8  A. Uh-huh.
9  Q. Is that a yes?
10 A. I hired him before.
11 Q. And when I say yes, I just want to make sure
12 the record -- I'm not trying to be a school teacher.
13 I just want to be sure she understands you're nodding
14 your head yes and that comes across as a yes on the
15 record.
16 A. Sorry.
17 Q. Okay. All right. You were asked questions
18 earlier by Plaintiff's counsel about your work with
19 T.J. Campbell Company.
20    And I believe your testimony was something
21 the effect of they tell you when to show up at the job
22 site and start the day. Is that fair?
23 A. Yes.
24 Q. And then once you arrive as a truck driver at
25 that job site they load your truck?

Page 62

1  A. Yes.
2  Q. And then the contractor then tells you where
3  to deliver that load?
4  A. Yes.
5  Q. Is that fair?
6  A. Yes.
7  Q. And, so, and you do that as a truck driver.
8  You pick up the load and you're told where to deliver
9  it and you haul it to that location and you unload it.
10 Is that fair?
11 A. Uh-huh.
12 Q. Is that pretty much the process on every job
13 you work? You are told to arrive at a certain time,
14 at a certain location, and pick up a load?
15 A. Yes.
16 Q. Okay. And then that company that you're
17 hauling the load for, they tell you where to deliver
18 the load, that's common?
19 A. Yes, sir.
20 Q. Okay. But as far as how you operate your
21 truck and how you drive that truck as a commercial
22 driver, that's your job as a truck driver; is that
23 fair?
24 A. Yes.
25 Q. The company that's hiring you to transport

Page 63

1  that load, they don't sit in the truck with you and
2  tell you how to operate that truck; is that fair?
3  A. (Witness nods head).
4  Q. Is that a yes?
5  A. No. They don't tell me how to drive the
6  truck.
7  Q. Right.
8     That's your job as the truck driver?
9  A. Yes.
10 Q. Is that correct?
11 A. Yes, sir.
12 Q. And you have been properly trained to do
13 that?
14 A. Yes.
15 Q. To perform that job. And, so, it's your job
16 to determine how to, one, if your load needs to be
17 secured, you as the truck driver, it's your job to
18 know how to secure that load. Is that fair?
19 A. Yes, sir.
20 Q. It's not Silver Star's job to tell you how to
21 secure the load; is that fair?
22 A. No.
23 Q. No, it's not fair or, yes, that is fair?
24 A. Not me. We are the guys that secure the
25 load, you know.

Page 64

1  Q. Truck driver secures the load?
2  A. Yes.
3  Q. Okay. So the truck driver, he knows where
4  he's going to pick up the load and he knows where to
5  deliver the load.
6     But it's the truck driver's job to determine
7  how to get that load from Point A to Point B?
8  A. Yes, sir.
9  Q. Okay. And is that true -- was that true for
10 Mr. Juarez on the date of the accident?
11    Do you understand my question?
12 A. Yes.
13 Q. Okay. Was that the same situation that day?
14 A. (Witness nods head).
15 Q. Is that a yes?
16 A. Yes.
17 Q. Okay. You were asked -- well, before I move
18 on, let me ask this: As a commercial truck driver,
19 the company or person that you're hauling the load
20 for, they also -- they don't tell you when to stop at
21 a stop sign; is that fair?
22 A. No, they don't.
23 Q. They don't tell you what speed to drive; is
24 that fair?
25 A. Yes.

                                                                65

1   Q.  They don't tell you when to go at an
2   intersection; is that fair?
3   A.  No.
4   Q.  They don't tell you when to yield --
5   A.  No.
6   Q.  -- at an intersection; is that fair?
7   A.  No.
8   Q.  I mean, when you're saying no, you're
9   agreeing with me?
10  A.  Yeah.  The company, they don't have to tell
11  us about that.
12  Q.  Okay.  And my point is, the job of a truck
13  driver in operating that truck, that is solely the
14  truck driver's job; is that fair?
15  A.  Yes, sir.
16  Q.  Okay.  Earlier when you were being asked
17  questions by Plaintiff's counsel and he asked a lot of
18  questions about a quota, a quota for loads delivered.
19      Are you aware of any quotas that Silver Star
20  gave Mr. Juarez concerning the number of loads he had
21  to haul each day?
22  A.  Sorry for interrupting.  Can you describe
23  that work quota, what you mean?
24  Q.  Yes, sir.
25      So my understanding of what that word means

                                                                66

1   is that the company, what was being implied, is that
2   Silver Star was requiring Mr. Juarez to deliver a
3   certain number of loads per day or he would lose his
4   job.
5   A.  Okay.
6   Q.  Are you aware of any requirement to deliver a
7   certain number of loads for him to continue to work on
8   that project?
9   A.  No.
10  Q.  He was paid by the hour?
11  A.  Hour; yes, sir.
12  Q.  Not by the load?
13  A.  Not by the load.
14  Q.  Do you know and were you ever told that
15  Mr. Juarez was pressured to deliver more loads than
16  what he was delivering each day for that project?  Did
17  anybody pressure him to do more than what he was
18  doing?
19  A.  No.
20  Q.  Okay.  You're not aware of that?
21  A.  No, I don't remember that.
22  Q.  Would that be unusual?
23  A.  It's unusual.
24  Q.  Okay.  As far as you know, Mr. Juarez kept
25  the number of hours he worked each day on that

                                                                67

1   project?
2   A.  Yes.
3   Q.  And when he kept that record you mentioned
4   that he wrote that down on a field ticket?
5   A.  Yes.
6   Q.  Is that a ORD trucking field ticket or is
7   that a Valle Trucking?
8   A.  Valle Trucking.
9   Q.  Okay.  So he would fill out the amount of
10  time he worked.  Mr. Juarez would turn that field
11  ticket into you as the owner of ORD Trucking.  Is that
12  fair?
13  A.  Yeah.
14  Q.  Once you received the ticket on a weekly
15  basis, if I understand your testimony correctly, on a
16  weekly basis, you would provide that field ticket to
17  Valle Trucking?
18  A.  Yes.
19  Q.  Valle Trucking would pay you the agreed
20  amount, the agreed upon hourly rate for the number of
21  hours worked by Mr. Juarez that week?
22  A.  Yes.
23  Q.  Okay.  As you sit here, I believe you
24  testified you don't remember what that rate was; is
25  that fair?

                                                                68

1   A.  I can't remember what the rate was, yes.
2   Q.  Okay.  But that rate, that hourly rate, I
3   assume would include an amount to compensate the
4   driver, to pay the driver?
5   A.  Yes.
6   Q.  But it would also include an amount that
7   covered the cost of your truck?
8   A.  On the fuel expense.
9   Q.  Or however you do it, whatever your rate is,
10  that's a rate to cover -- provide the truck?
11  A.  Yes.  Everything, yes.
12  Q.  And providing a driver?
13  A.  Yes.
14  Q.  And that's because it's ORD's driver,
15  correct?
16  A.  Yes.
17  Q.  And it's ORD's truck?
18  A.  Yes.
19  Q.  Okay.  And I believe you testified earlier
20  that Valle Trucking paid you for the time Mr. Juarez
21  worked on that project in Stillwater?
22  A.  Based on the ticket.
23  Q.  Okay.  And the only driver you had on that
24  project in Stillwater was Mr. Juarez?
25  A.  Yes, sir.

**Page 69**

1  Q. Okay. Were you ever told by Mr. Juarez was
2 the delivery -- was the delivery location always the
3 same place or do you know?
4  A. I don't remember that.
5  Q. Okay. You mentioned earlier that ORD
6 Trucking shared a yard with Valle Trucking?
7  A. A long time ago. Not where they are current.
8  Q. Okay. That was prior to the accident.
9     So at the time of the accident, you had
10 separate yards?
11  A. Yes, yes.
12  Q. Okay. And I thought I heard you say that
13 Mr. Juarez lived with you sometimes, or did I
14 misunderstand you?
15  A. Live with me?
16  Q. Live in the same house?
17  A. No, sir.
18  Q. Okay. I'm sorry.
19  A. He got his family. I got my family.
20  Q. Okay. It's not a fact that really matters.
21 I just thought when you were being asked about
22 conversations with him, I thought I heard you say he
23 lived with you. So it was worth asking.
24  A. No.
25  Q. My bad.

**Page 70**

1     Was the truck loaded at the time of the
2 accident?
3  A. Yes, sir.
4  Q. Okay. And I think you answered this one but
5 I'm going to ask you.
6     Did Mr. Juarez, I believe after this
7 accident, did he ever work for you or on that project
8 after the date of this accident?
9  A. No.
10  Q. Okay. And do you know if that truck, after
11 the accident, was dumped somewhere? Was unloaded?
12  A. Yes. We dump it over there at the same place
13 he get loaded.
14  Q. Okay. You unloaded it at the same place you
15 located it at the construction site?
16  A. We drop it at the same place he get loaded.
17  Q. And since you were at the construction site I
18 wanted to ask you, you mentioned parking it there.
19     This isn't --the construction site, my
20 understanding is we're not talking about, this isn't
21 constructing a highway. Is that fair?
22  A. It wasn't a highway. It was a housing
23 development over there.
24  Q. Is that a housing addition?
25  A. Yeah, kind of.

**Page 71**

1  Q. So they were preparing a place to build
2 homes?
3  A. Kind of. Buildings, or I don't know exactly
4 what they was.
5  Q. All right. So when you said you took the
6 truck and parked it on the job site, was there an open
7 area?
8  A. Yes.
9  Q. A place out of the way?
10  A. Big open big space over there where Silver
11 Star parked their equipment over there and there was
12 room for.
13  Q. So it's very different from a highway
14 construction project?
15  A. Yeah.
16  Q. It's not like you're parking the truck on the
17 side of the road?
18  A. No, no, no. It's not even legal.
19  Q. And I believe you testified no one had a
20 problem with you parking your truck out of the way on
21 the job site; is that fair? No one had an issue with
22 that?
23     Do you understand my question?
24  A. Say it again.
25  Q. Okay. When you testified that you parked the

**Page 72**

1 truck on that job site, and I believe you testified
2 Mr. Juarez got permission to park it there on the job
3 site; is that a fair statement?
4  A. Yes. They got -- everybody got permission to
5 park there.
6  Q. Okay. And to your knowledge no one with
7 Silver Star or anyone else had a problem with you
8 temporarily parking that truck --
9  A. No.
10  Q. -- on that job site after the accident?
11  A. No, sir.
12  Q. Okay. Do you know how -- do you know who
13 drove the truck back to your yard in Oklahoma City?
14  A. I drove it.
15  Q. Okay.
16  A. When? After the accident, like.
17  Q. Okay. And when did you transport the truck
18 back to your yard in Oklahoma City?
19  A. The next day after.
20  Q. The next day after the accident?
21  A. Yes.
22  Q. Okay. Sir, the truck that Mr. Juarez was
23 driving at the time of the accident, I believe you
24 testified that you -- that ORD Trucking owned that
25 truck; is that fair?

**Page 73**

1  A. Yes.
2  Q. And did ORD Trucking also perform all of the
3  maintenance required on that truck?
4  A. Yes, sir.
5  Q. Okay. And to your knowledge, was there
6  anything, was there any mechanical defect with that
7  truck prior to the accident?
8  A. No.
9  Q. It operated like it should?
10 A. Yes.
11 Q. It was in good repair?
12 A. Yeah.
13 Q. Okay. And after the accident were there any
14 repairs that were required to be made on that truck?
15 A. We done some repairs and one tire and stuff.
16 Q. And what were those repairs?
17 A. It was a tire that was a little cut and stuff
18 over there. A little crack on the frame.
19 Q. So you had to replace a tire?
20 A. Replace the tire; yes, sir.
21 Q. Okay. And what other repair did you have to
22 make?
23 A. Take the welder over there to get a little
24 crack on the frame.
25     MR. STEWART: Welder.

**Page 74**

1     THE WITNESS: Welder.
2  Q. (BY MR. HORTON) A welder on the frame of the
3  truck or are you talking about the rim of the --
4  A. No, no, no. On the frame of the truck.
5  Q. Okay. Other than those two things, any other
6  repairs?
7  A. No, sir.
8  Q. Okay. Prior to retaining the services of
9  Mr. Juarez to drive your truck on this job site in
10 Stillwater, for this job in Stillwater, did you have
11 any knowledge of any incidents where Mr. Juarez was
12 driving under the influence?
13 A. No, sir.
14 Q. Alcohol or drugs?
15 A. No, sir.
16 Q. No?
17 A. No.
18 Q. To this day do you know of him ever having
19 any issue with driving under the influence?
20 A. No, sir.
21 Q. Were you aware of any traffic citations that
22 he may have had prior to retraining his services?
23 A. No.
24 Q. Okay.
25 A. I can't recall that.

**Page 75**

1  Q. Do you know of any accidents that he had been
2  involved in prior to the date of this accident?
3  A. No, sir.
4  Q. You mentioned that you were familiar with his
5  driving and that you thought he was a safe driver. Is
6  that a fair representation of your prior testimony?
7  A. He was a safe driver.
8  Q. And explain to the jury how you know he was a
9  safe driver? What is your experience with --
10 A. Me and him, we ride together. He got a
11 different company. I drive my own truck. And he
12 seemed like a good driver.
13 Q. And to your knowledge had Mr. Juarez driven a
14 truck, a dump truck hauling loads prior to working for
15 your company?
16 A. Like can you repeat that one, please?
17 Q. Yeah. My understanding is you hired him to
18 operate your dump truck?
19 A. Yes.
20 Q. Did he have prior experience operating a dump
21 truck?
22 A. Yeah, yeah, yeah. He came to me trained
23 already, yeah.
24 Q. Okay. And do you know how many years
25 experience he had prior to working for you?

**Page 76**

1  A. Well, probably he got more than me. I don't
2  know. Maybe.
3  Q. More experience than you?
4  A. Yes.
5  Q. So he wasn't, and if I understand your
6  testimony, he wasn't a new driver?
7  A. He wasn't. No, he wasn't.
8  Q. He was an experienced driver?
9  A. Experienced driver, yes. Already trained and
10 stuff.
11 Q. I just want to be clear and I want to make
12 sure it's clear on the record, too, what ORD
13 Trucking's role was versus Silver Star Construction's
14 role.
15     Silver Star Construction didn't hire your
16 drivers; is that fair?
17 A. No, sir.
18 Q. Silver Star Construction, they didn't
19 determine what trucks your drivers would operate; is
20 that fair?
21 A. No, sir.
22 Q. Silver Star Construction, it wasn't their job
23 to train your drivers; is that fair?
24 A. No, sir.
25 Q. And I think we covered this but to be clear,

**77**

1 Silver Star Construction, it wasn't their job to tell
2 your drivers how to operate their trucks; is that
3 fair?
4    A. Yes.
5    Q. Based on what you know about the accident,
6 what you've learned from either being at the accident
7 scene, talking to Mr. Juarez, and this is certainly
8 not based on anything that you -- any discussions you
9 have had with your attorney, but just based on your
10 personal knowledge with being at the scene and talking
11 to Mr. Juarez about the accident, do you know in any
12 way how Silver Star Construction either caused or
13 contributed to this accident?
14    A. I don't know if Silver Star caused the
15 accident maybe, no.
16    Q. I'm sorry?
17    A. Silver Star, I don't know their involvement
18 in the accident.
19    Q. Yeah.
20       To your knowledge were they involved in the
21 accident at all?
22    A. I don't know about that.
23    Q. Okay. It wasn't their driver operating the
24 truck; is that fair?
25    A. The driver was operating the truck.

**78**

1    Q. Your driver was operating the truck?
2    A. Yes.
3    Q. It wasn't Silver Star's?
4    A. It wasn't Silver Star.
5    Q. Silver Star didn't own the truck he was
6 driving?
7    A. No, sir.
8    Q. And Silver Star was not responsible for
9 telling him how to operate the truck; is that fair?
10    A. Yes.
11    Q. Okay. Do you, as you sit here, based on your
12 knowledge, do you have any criticism, do you have
13 anything bad to say about Silver Star?
14    A. I don't have nothing to say bad about Silver
15 Star.
16       MR. HORTON: Okay. If I could, if
17 everybody is fine, can we take a little break just a
18 moment to let me look at my notes.
19       (Short Recess)
20    Q. (BY MR. HORTON) All right. We're back on
21 the record after a short break.
22       I went through my notes. I think I have just
23 one more question or series of questions.
24       On the tickets that were submitted by
25 Mr. Juarez on this project, I think you said they were

**79**

1 Valle Trucking tickets?
2    A. Yes.
3    Q. Do you know, did he -- do you know what name
4 he put on those tickets? What name he went by?
5    A. I don't recall exactly the name on it. But
6 they put the name like I was the lease over there.
7    Q. Did he go by any other name other than Israel
8 Juarez?
9    A. I can't recall that.
10    Q. Okay. You don't know if he had a nickname?
11    A. Yeah. I don't know.
12    Q. Okay. So the name that you would expect to
13 see is what on the tickets?
14    A. Driver, Israel.
15    Q. Israel?
16    A. Yes.
17       MR. HORTON: Okay. I'll pass the witness.
18       MR. CURRAN: I don't have any questions.
19 But I would like to withdraw my bad lawyer remark
20 earlier.
21       MR. WARDEN: I have no questions.
22       MR. HARMON: I'm with him. We've asked
23 our questions.
24       REDIRECT EXAMINATION
25 BY MR. POLCHINSKI:

**80**

1    Q. I've just got a few follow up for you.
2 Earlier you testified to counsel that you're not told
3 on a job site how fast to drive your truck when you're
4 delivering a load. Is that right?
5    A. Yes.
6    Q. Have you ever been told to drive a certain
7 speed or a certain time restriction when you're
8 delivering a load?
9    A. We go by the speed limits.
10    Q. Okay.
11    A. Otherwise you lose your license and --
12    Q. Currently your job at T.J. Campbell, have
13 they given you a time restriction on how long a load
14 is supposed to be delivered or picked up?
15    A. No.
16    Q. Have you ever heard of a company on a job
17 site timing a driver when they're either picking up or
18 delivering a load?
19    A. No. I mean, no.
20    Q. Okay. So you're an experienced driver of
21 over ten years?
22    A. Yes.
23    Q. And in your ten years of driving you have
24 never come across a job site where a supervisor is
25 timing you either how long it takes you to pick up or

**Page 81**

1  drop off a load?
2      A. Sometimes they do. But I just let those guys
3  over there play his own rules, you know. I work with
4  the guys that I feel safe.
5      Q. I'm sorry. What was that?
6      A. I mean, sometimes they have a bunch of guys,
7  they try to make more production, you know. But not
8  my current employers. They all drive safe, you know.
9      Q. Not your current employers; is that what you
10 said?
11     A. My present employers, they play it safe.
12 They pay hourly, you know.
13     Q. And when you say play it safe, you mean they
14 don't time you on how long to deliver a load?
15     A. The longest is if you're struck at the store
16 and just stay there, you know.
17     Q. And I understand you're saying T.J. Campbell,
18 your current employer, is safe and doesn't time you on
19 loads?
20     A. Yeah.
21     Q. But is it your testimony that you worked for
22 previous employers that were unsafe and they timed
23 your loads about how long it took you to deliver or
24 pick up?
25     A. Like say it again. Can you?

**Page 82**

1      Q. Yes. You said that you currently work for a
2  safe employer, correct?
3      A. Yes.
4      Q. Okay. And part of your employer currently
5  being safe is they don't time you on how long it takes
6  to deliver or pick up a load?
7          MR. HORTON: Objection to form.
8          THE WITNESS: No.
9      Q. (BY MR. POLCHINSKI) But you have worked for
10 previous employers that would time you on how fast you
11 were --
12     A. No. I don't like to work with those guys.
13     Q. Okay. Why do you not like to work with those
14 guys?
15     A. Because there's a lot of risk, you know.
16 They hit somebody, get hit, and you speed up or
17 something like that.
18     Q. And in those employers that you worked for
19 where they did those time restrictions and created
20 those conditions, would they ever reprimand you if you
21 didn't meet the time restriction?
22     A. No.
23     Q. Okay. Would it concern you if Israel Juarez
24 on September 4th of 2019 was timed on each load he
25 took and delivered by Silver Star Construction?

**Page 83**

1      A. No, no.
2      Q. Do you know anything about that?
3      A. No.
4      Q. Okay. Do you think it could create an unsafe
5  condition if Silver Star Construction was expecting
6  Israel Juarez to --
7      A. To do more loads and stuff?
8      Q. Yes.
9          MR. HORTON: Objection to form.
10     Q. (BY MR. POLCHINSKI) Tes. Go ahead.
11     A. Yes and no. He don't tell me nothing about
12 that, pushing him like that. Two more loads or stuff
13 like that.
14     Q. I'm going to read you Israel Juarez's
15 testimony from his deposition on Page 51, starting on
16 Line 11.
17     I asked him, "Would you ever be timed by
18 Silver Star or by anyone during your loads to see how
19 long it was taking to complete it".
20     And he responded yes.
21     So is it your testimony you had no idea that
22 Silver Star was timing him to see how long it would
23 take him to complete his loads?
24     A. I don't know about that.
25     Q. If Israel Juarez had told you that would you

**Page 84**

1  be concerned that they were timing him?
2      A. I don't recall that.
3      Q. Are you aware that Israel Juarez testified
4  that he heard of persons being reprimanded by Silver
5  Star Construction for taking too long on their loads?
6      A. No.
7      Q. Okay. Were you aware that Israel Juarez
8  testified that if you don't do enough loads just get
9  kicked out?
10     A. No.
11     Q. Okay. So you weren't aware that Silver Star
12 Construction was timing people at that job site and
13 reprimanding them?
14         MR. HORTON: Objection to form.
15         THE WITNESS: Like they want to do more
16 loads and stuff like that? Is that the question? I'm
17 sorry for not understanding.
18     Q. (BY MR. POLCHINSKI) No, no, no. Sure. So I
19 asked Israel Juarez, "So was time of the essence of
20 these loads to get there as quick as you could and try
21 to get back"? And he says yes.
22     Okay. And then I asked him, "Do you feel
23 that pressure as you were working that job to try to
24 get your load dumped off and get back to the job site
25 as quick as you could". And he said yes.

85

1    Does that surprise you?
2    A. Yes.
3    Q. Okay. Why does that surprise you?
4    A. Because, I mean, I don't know how fast they
5  wanted. But we just can go to what the limits is.
6  But if the limits is not enough for them, it's time to
7  go somewhere else.
8    Q. Right.
9       And had Israel Juarez told you they were
10 putting those time limitations on ORD Trucking and
11 there was a possibility of getting kicked off the job
12 site if he didn't meed those time limitations, would
13 you have continued to work for Silver Star
14 Construction?
15   A. No. I don't want to just work for them
16 because it's hard for me and hard for the truck and
17 everybody.
18   Q. Do you think it puts other persons on the
19 road at risk if drivers are put on time restraints
20 like?
21      MR. HORTON: Objection to form.
22      THE WITNESS: Well, it all depends, you
23 know, how fast do they want it and stuff like that.
24   Q. (BY MR. POLCHINSKI) So earlier when you
25 testified that -- strike that.

86

1       Earlier you testified that Silver Star
2  Construction shouldn't have told Israel Juarez how
3  fast or how slow to go, correct?
4    A. Yes.
5    Q. They shouldn't tell him how to drive his
6  vehicle that you own, correct?
7    A. Yeah.
8    Q. But by putting those time constraints and
9  pressure on your driver, do you think that that could
10 change his driving habits?
11      MR. HORTON: Objection to form.
12      THE WITNESS: Well, I don't know about
13 that, you know.
14      MR. POLCHINSKI: Okay. I have nothing
15 further.
16      MR. HORTON: Just follow up.
17         RECROSS-EXAMINATION
18 BY MR. HORTON:
19   Q. Mr. Ordones, to your knowledge, did anyone
20 ever tell you that Silver Star was putting any
21 pressure on Mr. Juarez to delivers loads faster or
22 slower or anything about how fast he was delivering
23 loads? Did you ever hear that as the owner of ORD
24 Trucking?
25   A. I can't recall exactly.

87

1    Q. Well, if somebody was being critical of the
2  way your driver was driving and potentially going to
3  kick them off the job, as the owner of ORD Trucking,
4  would you expect to hear about that?
5    A. Yes.
6    Q. Okay. And to your knowledge as you sit here
7  today, at any point in time before or after the
8  accident, did anyone tell you that Silver Star was
9  unhappy with the way Mr. Juarez was delivering loads
10 on this job?
11   A. Never tell me.
12   Q. They never told you?
13   A. Yeah.
14   Q. Okay. If Silver Star was requiring
15 Mr. Juarez to deliver loads faster wouldn't you expect
16 Mr. Juarez to tell you that that's what Silver Star
17 was asking him to do? Wouldn't you expect him to tell
18 you that?
19   A. Well, yes.
20   Q. Okay.
21   A. Because I need to know. Not capable to go
22 over there. Just come home.
23   Q. And I believe you testified earlier that
24 Mr. Juarez was in your opinion a safe driver?
25   A. Yes.

88

1    Q. If somebody told him to drive faster, do you
2  think Mr. Juarez would drive faster than what he felt
3  was safe?
4    A. Well, driving faster is not good for nobody.
5    Q. Yeah. But my question is different than
6  that.
7       My question is your knowledge of Mr. Juarez,
8  would you expect him to drive faster just because
9  someone was -- faster than he felt was safe just
10 because someone else was asking him to?
11   A. No.
12      MR. HORTON: Okay. No further questions.
13      MR. WARMAN: No follow up.
14      MR. POLCHINSKI: Mr. Ordones, you have the
15 right to read and sign this where Ms. Liz will type
16 everything up in a transcript and send it to your
17 attorney. And you guys can make whatever corrections
18 you want to make on it and send it back or you can
19 waive that right. And I trust your counsel is going
20 to tell you what to do.
21      MR. STEWART: We'll read and sign.
22      (Signature required; witness excused.)

89

```
 1        ** JURAT **
 2
 3     I, JESUS ORDONES, do hereby state under oath
 4  that I have read the above and foregoing deposition in
 5  its entirety and that with my corrections, if any
 6  there be, the same is a full, true and correct
 7  transcript of my testimony.
 8
                _____
 9
            JESUS ORDONES
10
11  STATE OF OKLAHOMA   )
                        )
12  COUNTY OF _____ )
13
14
15     SUBSCRIBED AND SWORN TO before me, the
16  undersigned Notary Public in and for the State of
17  Oklahoma by said witness, JESUS ORDONES, this
18  _____ day of _____ 2023.
19
20  _____   _____
21    NOTARY PUBLIC      CERTIFICATE NUMBER
      STATE OF OKLAHOMA
22
23
      MY COMMISSION EXPIRES: _____
24
25
```

91

```
 1        ** C E R T I F I C A T E **
 2
    STATE OF OKLAHOMA   )
 3              ) SS:
    COUNTY OF OKLAHOMA  )
 4
 5     I, Mary E. (Liz) Waggoner, a Certified Shorthand
 6  Reporter within and for the State of Oklahoma, do
 7  hereby certify that I reported all of the foregoing
 8  testimony, and that I later reduced it to typewritten
 9  form, as the same appears herein.
10     I further certify that I am not a relative of, nor
11  attorney for, nor clerk or stenographer for the
12  attorneys, or any party to this litigation, and that I
13  am not otherwise interested in the event of the
14  same.
15     I further certify that the above and foregoing
16  typewritten pages contain a full, true and correct
17  transcript of my stenograph notes so taken, during
18  said hearing.
19     WITNESS my hand and seal this 23rd day of July,
20  2023.
21
22       _____
          MARY E. (LIZ) WAGGONER, CSR
23       Oklahoma Certified Shorthand Reporter
             Certificate No. 00393
24         Expiration Date:  December 31, 2023
25
```

90

```
 1      ** CORRECTION SHEET **
 2
 3  NAME:  JESUS ORDONES
 4  DATE:  JULY 20, 2023
 5  REPORTER:  MARY E. (LIZ) WAGGONER, CSR
 6  PAGE NO.   LINE NO.   CORRECTION & REASON FOR CHANGE
 7  _____    _____    _____
 8  _____    _____    _____
 9  _____    _____    _____
10  _____    _____    _____
11  _____    _____    _____
12  _____    _____    _____
13  _____    _____    _____
14  _____    _____    _____
15  _____    _____    _____
16  _____    _____    _____
17  _____    _____    _____
18  _____    _____    _____
19  _____    _____    _____
20  _____    _____    _____
21  _____    _____    _____
22  _____    _____    _____
23  _____    _____    _____
24  _____    _____    _____
25  _____    _____    _____
```

** LOWERY & ASSOCIATES, INC. **
(405) 319-9990